IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

* * * * * * * * *

| | |
|---|---|
| FLYING J INC., a Utah corporation, TCH, LLC, a Utah corporation, CFJ PROPERTIES, a Utah partnership, TON SERVICES, INC., a Utah corporation, TFJ, a Utah Partnership, and NCR CORPORATION, a Maryland corporation, | Civil No. 1:96-CV-066BSJ |

)
)
)
)
)
)
)
)

Plaintiffs,

vs.

COMDATA NETWORK, INC., a
Maryland corporation, TRENDAR
CORPORATION, a Tennessee
corporation, and DOES 1 through 10,

Defendants.

**MEMORANDUM OPINION
& ORDER RE: ATTORNEY'S
FEES**

```
FILED
CLERK, U.S. DISTRICT COURT
November 15, 2007 (12:00pm)
DISTRICT OF UTAH
```

* * * * * * * * *

This case came before this court on remand from the court of appeals.  In *Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821 (10th Cir. 2005), that court reversed Judge Kimball's determination that Comdata breached the terms of one of two licenses (the "Trendar License") granted to plaintiffs pursuant to the parties' 2001 Settlement Agreement when Comdata refused to configure its Trendar point-of-sale credit card transaction system to clear transactions involving plaintiffs' TCH Mastercards directly through TCH's system, at truck stop locations where the merchants had *not* already agreed to accept TCH's proprietary fuel cards for purchases of fuel and other goods and services.

The factual background and procedural history of this litigation were aptly summarized in

the court of appeals' opinion, *see* 405 F.3d at 825-29, and will not be recounted here. Suffice it

to say that what began as a civil antitrust lawsuit evolved into a proceeding for enforcement of

the parties' Settlement Agreement—in particular, the enforcement of the plaintiffs' reading of

language in Article 4.2 of the Trendar License.

Article 4.2 states that all TCH card transactions "shall be cleared directly through TCH as

opposed to any third party network . . . to the fullest extent permitted by . . . third party network

providers." This would enable the plaintiffs to effectuate certain proprietary *data capture* and

*purchase control* features of its TCH fuel cards and TCH MasterCards in real time.[1] Plaintiffs

insist that this language requires prompt implementation by Comdata of "a method for direct

processing of TCH MasterCard transactions directly through TCH that is acceptable to TCH and

does not violate MasterCard rules"—and does not require the merchant's prior consent to the

processing of card transactions through TCH's system, in contrast to the merchant's chosen third-

party financial institution that would normally process the merchant's MasterCard purchase

transactions. The plaintiffs proposed a dual-processing system, under which the Trendar System

would send transaction data to TCH and the MasterCard network in two steps: TCH would

---

[1]As the court of appeals explained:

Proprietary payment cards offer two features relevant to this litigation. The first, called data capture, requires the truck driver to enter certain data at the time of the fuel purchase, typically including driver identification and odometer readings. The data is relayed in real time to the trucking company, allowing it to monitor the driver's location and activities. The second feature, called purchase control, allows trucking companies to restrict the type and quantity of items that the driver can purchase with the fuel card. A trucking company might, for example, allow its drivers to purchase motor oil and a certain amount of diesel fuel each day but prevent them from purchasing alcoholic beverages, a truck stereo, or enormous bags of pork rinds. Each trucking company can tailor purchase controls to suit its preferences. According to Flying J, data capture and purchase controls are essential to effective management of a long-haul trucking fleet, and they provide the principal incentive for trucking companies to give trucker fuel cards to their drivers rather than ordinary credit cards. Ordinary MasterCards do not have these features.

*Flying J Inc.*, 405 F.3d at 825-26.

authorize the transaction through its system, effectuating TCH's proprietary data capture and purchase controls, but financial settlement of the transaction would take place on the conventional MasterCard network, like other MasterCard purchases.

Judge Kimball agreed with the plaintiffs' reading, granted Flying J's motion to enforce the settlement agreement, and ordered Comdata to implement such a dual-processing method through a revised configuration of its entire Trendar System.

The court of appeals disagreed, finding the language of Article 4.2 to be ambiguous and that Comdata had produced "substantial evidence indicating that it did not contemplate or intend that the Trendar License would lead to proprietary processing of TCH MasterCards at unaffiliated merchants, much less that this would be accomplished through a dual processing model." *Flying J Inc.,* 405 F.3d at 835.

The *Flying J* panel found that "[t]he record is unequivocal on one point: both Flying J and Comdata intended the Trendar License to provide Flying J with data capture and purchase control similar to the so-called 'Comdata model.'" *Id.* at 836.  But Comdata did not use dual processing for its own proprietary cards; "Comdata's own cards were, and are, processed as single transactions.  The most straightforward interpretation of Article 4.2," the *Flying J* panel posited, "is that TCH MasterCard transactions would be processed in the same way."  *Id.*  And, as the panel pointed out, Comdata's cards "provided data capture and purchase control only when the merchant had agreed to accept its proprietary cards," supporting an inference that "merchant consent was central to Comdata's commercial arrangements and therefore to the Comdata model."  *Id.* at 837.  The *Flying J* panel concluded that Judge Kimball "clearly erred in finding that the parties intended the Trendar License to have the meaning urged by Flying J."  *Id.*  Indeed,

at the time of the settlement in 2001, neither party contemplated dual processing of TCH card transactions: "Flying J expected that TCH MasterCards would be processed exclusively through TCH rather than split between the TCH and MasterCard networks." *Id.* at 838.  In the court of appeals' view:

> Both parties anticipated that Article 4.2 would follow the Comdata model of MasterCard processing. The record shows that Comdata's arrangement with MasterCard followed a specific MasterCard policy for proprietary accounts, which involved unitary transactions and merchant consent.  There is evidence that Flying J had reason to know that Comdata intended these limits to apply to Article 4.2. Accordingly, we hold that the district court clearly erred in finding that the parties intended Article 4.2 to require proprietary TCH MasterCard transactions at all Trendar locations, regardless of merchant consent, by any feasible means.

*Id.* at 839.

On remand, Comdata reads the court of appeals' opinion in *Flying J* as foreclosing further consideration of the plaintiffs' proposed dual processing model, leaving "nothing remaining before the Court on plaintiffs' Motion to Enforce."  (Comdata's Reply Memorandum Concerning Issues to be Decided in This Case on Remand, filed June 1, 2006 (dkt. no. 727), at 2.)  Comdata submits that all that remains for consideration by this court is the question of an award of prevailing-party attorney's fees under the terms of the Settlement Agreement.

The plaintiffs respond by conceding that "the Tenth Circuit has now adopted a particular interpretation of Comdata's obligations under the Trendar License," namely that "TCH MasterCard transactions should be processed in the same way over Trendar as Comdata's own cards, using a single transaction instead of what the Tenth Circuit calls a 'dual processing model.'" (Plaintiffs' Statement of Remaining Issues to be Decided in This Case on Remand, filed May 26, 2006 (dkt. no. 726), at 4.)  "The Tenth Circuit called this the 'primary model,'"

plaintiffs continue, "and Plaintiffs believe that Primary Model is consistent with Comdata's

obligations under the Trendar License."  (*Id.*)  Yet as the *Flying J* panel pointed out, at the time

of the original evidentiary hearing before Judge Kimball,

> MasterCard confirmed in writing that Flying J's primary model did not meet its
> proprietary account rules. The dual-processing model fell outside of MasterCard
> rules. MasterCard noted, however, that it could not require that a merchant
> participate in the dual-processing arrangement, nor could it require a merchant to
> provide transaction data to Flying J.  MasterCard suggested that the merchant and
> its acquirer authorize its participation in the dual-processing arrangement.

> Because MasterCard rejected its original proposal, Flying J relied exclusively on
> the dual-processing model at the evidentiary hearing.

*Flying J Inc.*, 405 F.3d at 829.

The plaintiffs would now recant their abandonment of their "primary model" in favor of

their dual processing proposal, "seeking now to implement that Primary Model in a manner

consistent with the Tenth Circuit's interpretation of the Trendar License and to lay the foundation

for obtaining approval from MasterCard"—ostensibly by somehow bypassing MasterCard's

expressed preference for prior merchant consent to proprietary card transaction processing.

(Plaintiffs' Statement of Remaining Issues to be Decided in This Case on Remand, filed May 26,

2006 (dkt. no. 726), at 4.)    In correspondence with counsel for Comdata, the plaintiffs recount

that they asked Comdata to accede to a new "primary model" somewhat reminiscent of the fabled

Trojan horse:

> In treating TCH MasterCards the same ways as it treats Comdata
> MasterCards, Comdata will construe TCH MasterCards as having the same rights,
> privileges, and responsibilities *as a type of "CDN Card"* (as that term is used in
> the form of Comchek Service Center Agreement marked as Exhibit 2 at the
> deposition you [Michael Sheridan] gave on December 19, 2002 and in similar
> service center or merchant agreements). Thus, the TCH MasterCard will be
> treated *as a type of CDN Card* for purposes of all of Comdata's current and future

> service center or merchant agreements with travel plazas or truck stops that participate in the Comchek Network and use the Trendar System.

(*Id.* (quoting Exhibit "A," Letter, dated May 3, 2006, from Barre Burgon of Flying J to Michael Sheridan of Comdata, at 2) (emphasis added).)  It appears that plaintiffs thus propose to avail themselves of the existing merchants' consent to acceptance of Comdata proprietary cards by deeming TCH proprietary cards to be Comdata proprietary cards, regardless of whether those merchants would otherwise consent to accept TCH cards and proprietary processing of TCH card transactions.

It appears that the plaintiffs had advanced much the same notion sometime after the entry of Judge Kimball's September 25, 2003 Order, prompting Comdata to file a motion to clarify that order.  Granting that motion in part, Judge Kimball ruled that the September 25, 2003 Order did not obligate Comdata to disguise or treat TCH card transactions as Comdata card transactions.  (*See* Order, filed December 1, 2004 (dkt. no. 689), at 4.)

The court of appeals subsequently concluded that "finding that the parties intended Article 4.2 to require proprietary TCH MasterCard transactions at all Trendar locations, regardless of merchant consent, by any feasible means" was clear error.  *Flying J Inc.* at 839.  It seems likely that "any feasible means" would comprehend the sort of Trojan horse model now suggested by plaintiffs' counsel.

Having reviewed the record with some care, this court concludes that the question of "'[w]hat specific steps Comdata proposes to take to help TCH obtain approval from MasterCard for the "primary model" based on its obligation under Article 4.2 of the Trendar License, which requires Comdata to use its "best reasonable efforts to obtain any consents required by third party

network providers,'"'"[2]—raised by the plaintiffs for the first time in this case after remand by the

court of appeals—is a matter for another day, and probably another lawsuit.  The court is

likewise persuaded that the sole question remaining before this court after remand is the issue of

prevailing-party attorney's fees.  (*See also* Order, filed August 2, 2006 (dkt. no. 735).)

## COMDATA'S MOTION FOR ATTORNEY'S FEES

### A.   The Governing Contractual Language

Comdata bases its request for attorney's fees in this case on the parties' Settlement

Agreement, which authorizes "reasonable attorneys' fees" for "the prevailing Party" incurred in

connection with an arbitration or lawsuit arising from that agreement:

> **12. Attorneys' Fees.** The Parties agree that if an arbitration or lawsuit becomes
> necessary to resolve any dispute concerning any Party's obligations or rights under
> this Settlement Agreement, the prevailing Party shall be entitled to recover as
> damages from the non-prevailing Party reasonable attorneys' fees incurred in
> connection with such arbitration and/or lawsuit, including the cost of any court
> enforcement, if necessary.

(Settlement Agreement at 11 ¶ 12 (hereinafter "Section 12")(attached as Exhibit "B" to Request

For Status Conference of Defendant Comdata Network, Inc., filed March 8, 2006 (dkt. no.

706)).)

Plaintiffs invoked the Settlement Agreement as the basis of their motion for enforcement

in the proceedings conducted before Judge Kimball, on direct review before the court of appeals,

and in their statement of issues after remand.  They have invoked Section 12 of the Settlement

Agreement as the footing for their request for an award of attorney's fees filed in 2003 and

---

[2](Plaintiffs' Statement of Remaining Issues to be Decided in This Case on Remand, at 5 (quoting Exhibit "A",
at 3).)

granted in part by Judge Kimball.[3]  More recent suggestions that the attorney's fees incurred by

the parties in this proceeding were incurred "in connection with the Trendar License"—as

distinguished from the Settlement Agreement upon which this enforcement proceeding was

footed—seem dubious at best.[4]

    For purposes of the consideration of Comdata's Motion for an Award of Attorney's Fees,

Section 12 of the Settlement Agreement remains the governing contractual provision.

## B.  The Lodestar Method

    In dealing with "prevailing party" attorney's fees provisions, courts in this Circuit[5]—and

courts in this State[6]—generally determine what is a reasonable fee by first figuring a "lodestar"

---

[3](*See* Flying J Plaintiffs' Memorandum in Support of Motion for Award of Attorney's Fees Based on Court's September 25, 2003 Order, filed October 5, 2003 (dkt. no. 640), at 1.)

[4](*See, e.g.*, Transcript of Hearing, dated September 14, 2006 (dkt. no. 739) ("Tr. 9/14/06"), at 15:18-19:14, 54:19-57:8, 91:12-22 (Mr. Kerwin).)

[5]*See, e.g., Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998) ("To determine the reasonableness of a fee request, a court must begin by calculating the so-called 'lodestar amount' of a fee, and a claimant is entitled to the presumption that this lodestar amount reflects a 'reasonable' fee." (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563-65 (1986), and *Cooper v. Utah*, 894 F.2d 1169, 1171 (10th Cir. 1990))); *Jane L. v. Bangerter*,  61 F.3d 1505, 1509 (10th Cir. 1995) (same).

[6]*See, e.g., Barker v. Utah Public Service Comm'n*,  970 P.2d 702, 708 (Utah 1998) ("As courts often do, we will use the lodestar method in considering the attorney fees in this case." (citing Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 242-43 (1985))).
The plaintiffs submit that the enforcement of Section 12 is governed by Utah law.  (*See* Plaintiffs' Response in Opposition to Comdata's Motion for an Award of Attorneys' Fees, filed June 5, 2006 (dkt. no. 729) ("Pltfs' Resp. Mem"), at 6 ("Under Utah law, which governs the fee-shifting provision of the Settlement Agreement here, . . . .").)  *Cf. Stichting Mayflower Recreational Fonds v. Newpark Res., Inc.*, 917 F.2d 1239, 1248 (10th Cir.1990) (applying Utah law, including Utah law on the prevailing party doctrine and the net judgment rule, to a Utah mining lease which contained a provision entitling the prevailing party to recover reasonable attorney's fees).

In Utah, attorney fees may be awarded "if authorized by statute or by contract." *Dixie State Bank v. Bracken*, 764 P.2d 985, 988 (Utah 1988).  A court should grant reasonable attorney fees in accordance with a written contractual provision. *See Cobabe v. Crawford*, 780 P.2d 834, 836 (Utah Ct. App. 1989). A court may, however, refuse to grant attorney fees in extraordinary circumstances. *See id.* at 836 n.3 (citing examples of conduct justifying the refusal of attorney fees, such as forfeiture, multiple rejected settlement offers, and acting improperly). . . . Further, we consider a "contractual provision allowing attorney fees 'in connection with litigation' to include appeals."  *Id.* at 837.

(continued...)

amount and then adjusting that figure based on facts specific to the case.  *See Blum v. Stenson*, 465 U.S. 886, 888 (1984); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563-65 (1986) (reaffirming that the lodestar is presumptively reasonable).[7]  The normal "lodestar" attorney's fee award is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate, and adding to that the prevailing party's reasonable expenses.  *See Blum*, 465 U.S.at 888; *Browder v. City of Moab*, 427 F.3d 717, 722 n.9 (10th Cir. 2005) (defining the "lodestar" as the "product of the number of attorney hours 'reasonably expended' and a 'reasonable hourly rate.'" (quoting *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir.1998) (citing *Hensley*, 461 U.S. at 433))).  As the court of appeals instructs,

> To determine a reasonable attorneys fee, the district court must arrive at a 'lodestar' figure by multiplying the hours plaintiffs' counsel reasonably spent on the litigation by a reasonable hourly rate."  *Jane L.*, 61 F.3d at 1509. "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Mares*, 801 F.2d at 1201 (quoting *Hensley*, 461 U.S. at 437, 103 S.Ct. 1933).

*Case v. Unified School Dist. No. 233, Johnson County, Kan.*, 157 F.3d 1243, 1249 (10th Cir.

---

[6](...continued)

*Crowley v. Black*, 2007 UT App 245 ¶ 12, ___ P.3d ___, 2007 WL 2007577, at *3 (Utah Ct. App. 2007). *See also Foote v. Clark*, 962 P.2d 52, 54 (Utah 1998) (stating that when "[f]ees [are] provided for by contract, ... [they] are allowed only in strict accordance with the terms of the contract").

[7]As the Utah Supreme Court has recounted:

"Lodestar" is a term which was coined by the court in *Lindy Brothers, Inc. of Philadelphia v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973).  Under this approach, the court starts by determining the hours counsel has reasonably spent on the case and then adjusts the hourly compensation either up or down by a multiplier the court determines appropriate.  In determining the multiplier, the court considers various factors, among them the quality of the work performed, the contingent nature of the case, the plaintiff's burden, the risks assumed in developing the case, and the delay in the receipt of the payment.  *See generally* 78 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 1803 (2d ed. 1986).

*Plumb v. State,* 809 P.2d 734, 738 n.7 (Utah 1990).

1998) (quoting *Jane L. v. Bangerter*, 61 F.3d 1505, 1509 (10th Cir. 1995), and *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1201 (10th Cir. 1986)).

The party requesting attorney's fees thus bears the burden of proving the amount of hours spent on the case and the appropriate hourly rates. *See Case*, 157 F.3d at 1249. The fee petitioner must "submit evidence supporting the hours worked and rates claimed" to satisfy this burden. *Hensley*, 461 U.S. at 434.[8] Even then, an award of attorney's fees represents an exercise of discretion:

> While this Court has identified "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate" as "[t]he most useful starting point for determining the amount of a reasonable fee," *Hensley v. Eckerhart*, 461 U.S., at 433, 103 S.Ct., at 1939, the "product of reasonable hours times a reasonable rate does not end the inquiry," *id.*, at 434, 103 S.Ct., at 1940, for "there may be circumstances in which the basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high." *Blum v. Stenson*, 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). "A district court is expressly empowered to exercise discretion in determining whether an award is to be made and if so its reasonableness." *Id.*, at 902, n. 19, 104 S.Ct., at 1550, n.19. See *Hensley v. Eckerhart*, 461 U.S., at 437, 103 S.Ct., at 1941.

*Evans v. Jeff D.*, 475 U.S. 717, 736 n.26 (1986). In this context, "The district court's calculation is thus anything but an arithmetical exercise." *Id.*

In addition to the standard lodestar calculation, a federal district court may consider the reasonableness of the attorney's fees in light of a prevailing party's success or lack thereof, and then adjust the fee upward or downward. *Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088, 1103 (10th Cir. 2005) ("When a plaintiff succeeds on some claims but fails on others, the court must

---

[8]*Blum* and *Hensley* involved awards of attorney fees under 42 U.S.C. § 1988, as opposed to the attorney's fees provision of a private contract. Even so, the court believes that their principles are sound and provide useful guidance on the issues now before this court. *See Harvey Barnett, Inc. v. Shidler*, 200 Fed. Appx. 734, 746 n.13 (10th Cir. 2006).

consider whether to adjust the lodestar to reflect the plaintiff's overall success level . . . ."); *Browder v. City of Moab*, 427 F.3d 717, 722 (10th Cir. 2005) (explaining that where a party "'achieved only partial or limited success,' the calculation for reasonable attorney's fees requires more than just determining 'the product of hours reasonably expended on the litigation *as a whole* times a reasonable hourly rate'" because such may be an excessive amount (emphasis in original)).

> The fees requested may also be adjusted in light of the parties' contractual expectations:
>
> > where contracting parties have agreed that a breaching party will be liable for attorneys' fees, the purpose of the award is to give the parties the benefit of that bargain, and the court's responsibility is to enforce that bargain.  Normally, where the court is merely enforcing a contractual provision authorizing attorneys' fees, the fees are routinely awarded and the contract is enforced according to its terms. *See  Fortier v. Dona Ana Plaza Partners*, 747 F.2d 1324, 1337-38 (10th Cir. 1984) (applying New Mexico law); *Engel v. Teleprompter Corp.*, 732 F.2d 1238, 1241 (5th Cir.1984); *Austin v. Parker*, 672 F.2d 508, 518-20 (5th Cir. Unit A 1982); 6 *Moore's Federal Practice* ¶ 54.78[2] (1987).

*United States for Use of C.J.C., Inc. v. Western States Mechanical Contractors, Inc.*, 834 F.2d 1533, 1549 (10th Cir. 1987).[9]  A court may reduce the amount of contractual attorney's fees requested if it finds such an award "would be inequitable and unreasonable."  *Id.* at 1549 (explaining that "the trial court's role is to determine if the claimed fees are inequitable or unreasonable.  If so, the trial court has discretion to deny or reduce the fee award").

> Under Utah law,
>
> > Where the parties have agreed by contract to the payment of attorney fees, the court may award reasonable fees in accordance with the terms of the parties'

---

[9]Comdata ostensibly adopts the plaintiff's previously expressed view that "the prevailing party should be awarded attorneys' fees and costs that were reasonably foreseeable at the time the parties entered in[to] the Settlement Agreement, " and asserts that all of its fees and costs were reasonably foreseeable to plaintiffs and thus "Comdata is entitled to recover its fees and expenses in their entirety."  (Comdata Mem. at 3, 4.)  The plaintiffs' response does not speak to the question of foreseeability, instead assailing Comdata's requested fees as being inequitable and unreasonable.

agreement.  The amount to be awarded is largely within the sound discretion of the trial court, but such factors should be considered as the relationship of the fee to the amount recovered, the novelty and difficulty of the issues involved, the overall result achieved and the necessity of initiating a lawsuit to vindicate rights under the contract.  In addition, a party is entitled only to those fees attributable to the successful vindication of contractual rights within the terms of their agreement.

*Trayner v. Cushing*, 688 P.2d 856, 858 (Utah 1984) (footnotes omitted) (citing *Turtle Management, Inc. v. Haggis Management*, 645 P.2d 667 (Utah 1982)).  In *Cabrera v. Cottrell*, 694 P.2d 622 (Utah 1985), the Utah court added additional factors into the mix, including "the difficulty of the litigation, the efficiency of the attorneys in presenting the case, the reasonableness of the number of hours spent on the case, the fee customarily charged in the locality for similar services, the amount involved in the case and the result attained, and the expertise and experience of the attorneys involved."  *Id.* at 625.

Subsequently, the Utah Supreme Court distilled the analysis of attorney's fees requests into a series of four questions: "1. What legal work was actually performed?"; "2. How much of the work performed was reasonably necessary to adequately prosecute the matter?"; "3. Is the attorney's billing rate consistent with the rates customarily charged in the locality for similar services?"; and "4. Are there circumstances which require consideration of additional factors, including those listed" in the applicable rules of professional conduct?  *Dixie State Bank v. Bracken*, 764 P.2d 985, 990 (Utah 1988) (footnote omitted).[10]

---

[10]These "additional factors" include

the novelty and complexity of the issues involved; the likelihood that the representation will preclude the lawyer or lawyers from accepting other employment; the expertise, experience, and reputation of the lawyer or lawyers; the amount involved and results obtained; the time limitations imposed by the client or the circumstances; the length and nature of the attorney-client relationship; and whether the requested fee is fixed or contingent.

(continued...)

It is important to note that with this analysis, what an attorney bills or the number of hours spent on a case is not determinative. *See Cabrera v. Cottrell*, 694 P.2d at 624-25. The appropriateness of the work actually performed and of the attorney's billing rate is evaluated before a reasonable fee is set. In addition, although the amount in controversy can be a factor in determining a reasonable fee, care should be used in putting much reliance on this factor.

*Id.*

*Dixie State Bank* noted that a trial court has "broad discretion in determining what constitutes a reasonable fee," *id.* at 991; *accord, Jensen v. Sawyers*, 2005 UT 81, ¶ 127, 130 P.3d 325, 348, but the Utah Court of Appeals has warned that a trial court "'abuses its discretion in awarding less than the amount [of attorney fees] requested *unless* the reduction is warranted' by one or more of the above factors," *Endrody v. Endrody*, 914 P.2d 1166, 1171 (Utah Ct. App. 1996) (alteration in original) (citation omitted); *see also Saunders v. Sharp*, 818 P.2d 574, 580 (Utah Ct. App.1991) (noting that trial court erred because it reduced, without explanation, the prevailing party's attorney fees). The trial court's discretion is further constrained by the fact that contractual attorney's fee awards involve a matter of legal right:

We begin our analysis with the premise that "[p]rovisions in written contracts providing for payment of attorney fees should ordinarily be honored by the courts." *Stacey Properties v. Wixen*, 766 P.2d 1080, 1085 (Utah Ct. App.1988) (quoting *Soffe v. Ridd*, 659 P.2d 1082, 1085 (Utah 1983)). "Furthermore, contrary to [the] contention that attorneys fees should be determined on the basis of an equitable standard, attorneys fees, when awarded as allowed by law, are awarded as a matter of legal right." *Cabrera v. Cottrell*, 694 P.2d 622, 625 (Utah 1985). "Since the right is contractual, the court does not possess the same equitable discretion to deny attorney's fees that it has when fashioning equitable remedies, or applying a statute which allows the discretionary award of such fees." *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 226 (5th Cir. 1975).

---

[10](...continued)

*Matter of Estate of Quinn*, 830 P.2d 282, 285 (Utah Ct. App. 1992) (citing Utah code of Professional Responsibility DR 2-106 and Rule 1.5, Utah Rules of Professional Conduct).

*Cobabe v. Crawford*, 780 P.2d 834, 836 (Utah Ct. App. 1989) (footnote omitted).

The contractual right to an award of attorney's fees extends to fees incurred both in the

trial court and on appeal:

> The Utah Supreme Court has held that "a provision for payment of attorney's fees in a contract includes attorney's fees incurred by the prevailing party on appeal as well as at trial, if the action is brought to enforce the contract." *Management Servs. Corp. v. Development Assocs.*, 617 P.2d 406, 409 (Utah 1980). The Sturzeneggers argue that such an award is appropriate only when a defendant prevails both below and on appeal. Such an argument is without merit. *See id.* ("'The purpose of a provision for attorney's fees is to indemnify the creditor or the prevailing party against the necessity of paying an attorney's fee and to enable him to recover the full amount of the obligation.'" (quoting *Zambruk v. Perlmutter 3rd Gen. Builders, Inc.*, 32 Colo.App. 276, 510 P.2d 472, 476 (1973))).

*Ron Case Roofing & Asphalt Paving, L.L.C. v. Sturzenegger*, 158 P.3d 556, 561-562 (Utah Ct.

App. 2007); see also *Cobabe v. Crawford*, 780 P.2d at 837; *Crowley v. Black*, 2007 UT App 245,

¶ 12, 167 P.3d 1087, 1090.

### (1)  Reasonable Hours

As the court of appeals instructs:

> In order to prove the number of hours reasonably spent on the litigation, the party must submit "meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks." *Id.* at 1250. The district court can reduce the number of  hours when the time records provided to the court are inadequate. *Id.*  Finally, the district court must reduce the actual number of hours expended to a reasonable number to ensure services an attorney would not properly bill to his or her client are not billed to the adverse party.  *Id.*

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1233-34 (10th Cir. 2000)

(quoting *Case*, 157 F.3d at 1250).[11]  A district court is justified in reducing the reasonable

---

[11]*See also Crumpacker v. Kansas, Dept. of Human Resources*, 474 F.3d 747, 756-57 (10th Cir. 2007) ("It is true
(continued...)

number of hours if the attorney's time records are sloppy and imprecise and fail to document

adequately how he or she utilized large blocks of time. *Case*, 157 F.3d at 1250.[12]

Moreover, "The fee applicant should exercise billing judgment with respect to the

number of hours worked and billed. . . . Billing judgment consists of winnowing hours actually

expended down to hours reasonably expended." *Praseuth v. Rubbermaid, Inc.*, 406 F.3d

1245,1257 (10th Cir. 2005) (citing *Hensley*, 461 U.S. at 437, and *Case*, 157 F.3d at 1250).  "The

trial judge is not obligated to accept the fee applicant's billing judgment uncritically. . . ."  *Id.*

(citation omitted).  In order to prevent paying "a Michelangelo . . . Sistine Chapel rates for

painting a farmer's barn," the court must scrutinize the records and weed out non-professional

and excessive tasks.  *New Mexico Citizens For Clean Air And Water v. Espanola Mercantile*

*Company, Inc.*, 72 F.3d 830, 834 (10th Cir. 1996) (quoting *Ursic v. Bethlehem Mines*, 719 F.2d

670, 677 (3d Cir.1983)).

*Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983), suggests that among the factors to be

considered are (1) whether the tasks being billed "would normally be billed to a paying client,"

(2) the number of hours spent on each task, (3) "the complexity of the case," (4) "the number of

reasonable strategies pursued," (5) "the responses necessitated by the maneuvering of the other

side," and (6) "potential duplication of services" by multiple lawyers. *Id.* at 554.  *Ramos*

_____

[11](...continued)
that we require billing records submitted in connection with a fee request to '. . . reveal, for each lawyer for whom fees
are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks. . . .'
*Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir.1983).");  *Sheets v. Salt Lake County*, 45 F.3d 1383, 1391 (10th Cir. 1995)
(assigning to party claiming attorney's fees the burden of documenting their extent and reasonableness "with meticulous
and contemporaneous time records" (citing *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1210 (10th Cir. 1986))).

[12]"Nonetheless, if the district judge wants to grant less than the requested hourly rate or cuts back the number of
hours spent on the case, he must provide '""a concise but clear explanation""' of his reasons."  *Tomazzoli v. Sheedy*, 804
F.2d 93, 97 (7th Cir. 1986) (quoting *Lynch v. City of Milwaukee*, 747 F.2d 423, 427-28 (7th Cir. 1984)).

suggests that a district court should approach this reasonableness inquiry "much as a senior partner in a private law firm would review the reports of subordinate attorneys when billing clients. . . ."  *Id.* at 555.  And as outlined above, the Utah courts have held that "[w]hen determining what constitutes a reasonable award of attorney fees, the trial court should consider several factors, some of which include the amount of work actually performed and the amount of work 'reasonably necessary to adequately prosecute the matter.'"  *Moore v. Smith*, 2007 UT App 101, ¶ 53,158 P.3d 562, 578 (quoting *Dixie State Bank*, 764 P.2d at 989-90); *see Cottonwood Mall Co. v. Sine*, 830 P.2d 266, 269 (Utah 1992) (in determining attorney fees, trial courts may consider several factors, including "'the difficulty of the litigation, the efficiency of the attorneys in presenting the case, [and] the reasonableness of the number of hours spent on the case.'" (quoting *Cabrera v. Cottrell*, 694 P.2d 622, 625 (Utah 1985))).

As outlined above, the hours included in calculation of the lodestar must be hours "reasonably expended on the litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Where hours are not reasonably expended, such as where an attorney lacks skill or experience, or where the attorney fails to exercise billing judgment, the hours deemed by the court to be unreasonable must be excluded from the calculation.  *Id.* at 434.  A court must exclude hours which are "excessive, redundant, or otherwise unnecessary."  *Hensley*, 461 U.S. at 434.

As to services provided by non-lawyers, the analogy to statutory attorney's fees provisions again proves to be instructive:

> if "law clerk and paralegal services are ... not reflected in the [attorney's fee], the court may award them separately as part of the fee for legal services.  The court should scrutinize the reported hours and the suggested rates in the same manner it scrutinizes lawyer time and rates." *Ramos*, 713 F.2d at 558-59.  Thus, under the rubric of 42 U.S.C. § 1988 "attorney's fees," the fees for attorneys, law clerks, and

-16-

legal assistants are all determined in the same fashion: multiplying reasonable
hours by reasonable rates to reach a "lodestar" amount.

*Case*, 157 F.3d at 1249; *see Ramos*, 713 F.2d at 558-59;[13] *see also Baldwin v. Burton*, 850 P.2d

1188, 1200-01 (Utah 1993) (finding that it was proper for the trial court to include services

provided by a paralegal in its award of attorney fees).

### (2)  Hourly Rate

As the court of appeals has explained:

When determining the appropriate rate to apply to the reasonable hours, "the
district court should base its hourly rate award on what the evidence shows the
market commands for . . . analogous litigation." *Id.* at 1255.  The party requesting
the fees bears "the burden of showing that the requested rates are in line with
those prevailing in the community for similar services by lawyers of reasonably
comparable skill, experience, and reputation." *Ellis v. University of Kan. Med.
Ctr.*, 163 F.3d 1186, 1203 (10th Cir. 1998) (quotation marks and citation omitted).
The focus must be on the "prevailing market rate in the relevant community." *See
id.* (quotation marks and citation omitted).  "[A] district court abuses its discretion
when it ignores the parties' market evidence and sets an attorney's hourly rate
using the rates it consistently grant[s]." *Case*, 157 F.3d at 1255 (quotation marks
and citation omitted). The court may not use its own knowledge to establish the
appropriate rate unless the evidence of prevailing market rates before the court is
inadequate. *Id.* at 1257; *see Lucero v. City of Trinidad*, 815 F.2d 1384, 1385
(10th Cir. 1987).

*United Phosphorus*, 205 F.3d at 1234.[14]  "The general rule is that a reasonable hourly rate is

---

[13]*Ramos* instructed that

[t]he district court must determine whether law clerk and paralegal services are normally part of the
office overhead in the area, and thus already reflected in the normal area billing rate the court has
established in the case.  If those services are not reflected in the area rate, the court may award them
separately as part of the fee for legal services. The court should scrutinize the reported hours and the
suggested rates in the same manner it scrutinizes lawyer time and rates.

[14]*See also Lippoldt v. Cole*, 468 F.3d 1204, 1224-25 (10th Cir. 2006) ("To determine what constitutes a
reasonable rate, the district court considers the 'prevailing market rate in the relevant community.'  *Malloy v. Monahan*,
73 F.3d 1012, 1018 (10th Cir. 1996).  Plaintiffs must provide evidence of the prevailing market rate for similar services
by 'lawyers of reasonably comparable skill, experience, and reputation' in the relevant  community.  *Blum*, 465 U.S. at
895 n. 11, 104 S.Ct. 1541; *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1255-56 (10th Cir. 1998)."); *Beard v.
Teska*, 31 F.3d 942, 955 (10th Cir. 1994) ("[O]n the hourly rate issue, the applicant may meet that burden by way of

(continued...)

-17-

calculated according to the prevailing market rates in the community." *Washington v. Philadelphia Court of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir. 1996); *see also Rode*, 892 F.2d at 1183 (noting that hourly rates must be reasonable in comparison with market place rates for similar services rendered by lawyers of comparable skill, experience and reputation). Where the prevailing party "has met his prima facie burden under the 'community market rate' lodestar test, and the opposing party has not produced contradictory evidence, the district court may not exercise its discretion to adjust the requested rate downward." *Washington*, 89 F.3d at 1036.

The burden is on the fee applicant to produce satisfactory evidence "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895 n.11. "A rate determined in this way is normally deemed to be reasonable, and is referred to–for convenience– as the prevailing market rate." *Id.* Once evidence of this market rate is accepted by the court, it establishe[s] a benchmark that the district judge [is] not free to ignore." *Henry v. Webermeir*, 738 F.2d 188, 193 (7th Cir. 1984).

In this case, Comdata requests that its attorney's fees be paid at the following hourly rates:

---

[14](...continued)
satisfactory evidence—in addition to the attorney's own affidavit—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably compared skill, experience, and reputation.")

| Morgan, Lewis & Bockius | | | |
|---|---|---|---|
| **Name** | **Title** | **Office** | **Hourly Rate** |
| **J. Gordon Cooney, Jr.** | Partner | Philadelphia | **$425**  (2002)<br>**$450**  (2003 to 2006) |
| **Michael L. Pillion** | Partner | Philadelphia | **$450**  (2004) |
| **Peter Buscemi** | Partner | Washington, D.C. | **$500**  (2003)<br>**$550**  (2004)<br>**$600**  (2005)<br>**$675**  (2006) |
| **P. Daffodil Tyminsky** | Associate | Philadelphia/L.A. | **$195**  (2002)<br>**$240**  (2003 to 2006) |
| **Timothy D. Mygatt** | Associate | Philadelphia | **$160**  (2003 to 2006) |
| **Lauren Shank** | Associate | Philadelphia | **$290**  (2004) |
| **Melissa Maniglia** | Associate | Philadelphia | **$130**  (2003 to 2005) |
| **Jane S. Cochrane** | Paralegal | Philadelphia | **$180**  (2005)<br>**$200**  (2006) |

| Howrey LLP<br>Bendinger, Crockett, et al. | | | |
|---|---|---|---|
| **Name** | **Title** | **Office** | **Hourly Rate** |
| **John H. Bogart** | Partner | Salt Lake City | **$200**  (2002 to 2005)<br>**$350**  (2006) |
| **Robert A. Peterson** | Partner | Salt Lake City | **$320**  (2003) |
| **Lisa R. Peterson** | Partner | Salt Lake City | **$200**  (2003) |
| **Rod N. Andreason** | Associate | Salt Lake City | **$200**  (2004) |
| **Christian Brown** | Paralegal | Salt Lake City | **$135**  (2006) |
| **Christopher Vaeth** | Paralegal | Salt Lake City | **$110**  (2003 to 2004) |
| **Marie Elliott** | Paralegal | Salt Lake City | **$115**  (2003) |

Comdata submitted the written affidavits of J. Gordon Cooney, Jr. and John H. Bogart and offered the in-court testimony of attorney Milo S. Marsden, each attesting to the reasonableness of the requested rates.

For their part, the plaintiffs did not controvert the reasonableness of the *rates* requested by Comdata, and offered no significant probative evidence disputing the averments of Cooney and Bogart, or contradicting Marsden's proffered opinion on that issue. As the plaintiffs have not objected to the reasonableness of the hourly *rates* requested by Comdata, and have not offered evidence to contradict the reasonableness of the hourly rates requested, the court concludes that Comdata shall be awarded attorney's fees at the rates requested.

### (3) Objections to Requested Attorney's Fees

The party opposing the fee award has the burden to challenge, by affidavit or brief with sufficient specificity to give fee applicants fair notice, the reasonableness of the requested fee. *See, e.g., Bell v. United Princeton Props., Inc.*, 884 F.2d 713, 715-20 (3rd Cir. 1989). "Once the adverse party raises objections to the fee request, the district court has a great deal of discretion to adjust the fee award in light of those objections." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990) (citing *Bell*, 884 F.2d at 721). Where the opposing party has "made only generalized objections to the amount of the fees awarded, without any 'evidence challenging the accuracy and reasonableness of the hours charged,'" they have "waived their right to challenge the determination that the fees awarded were reasonable." *Martinez v. Roscoe*, 100 F.3d 121, 124 (10th Cir. 1996) (quoting *Blum*, 465 U.S. at 892 n.5).

### C. Comdata's Requested Attorney's Fees Award

Comdata requests an award of attorney's fees in the aggregate sum of **$1,058,920.50**,

ostensibly incurred in connection with its defense of the plaintiffs' Motion to Enforce the May

2001 Settlement Agreement; Comdata divides this claimed fee amount among eight discrete

phases of the settlement agreement enforcement proceeding: (1) the initial proceedings on the

plaintiffs' Motion to Enforce (through the evidentiary hearing and entry of Judge Kimball's

September 25, 2003 Order); (2) implementation of the September 25, 2003 Order and the

formulation of the Preliminary Development Agreement; (3) Comdata's motion to clarify Judge

Kimball's September 25, 2003 Order; (4) the appeal; (5) the plaintiffs' petition for panel

rehearing and request for rehearing en banc; (6) the plaintiffs' petition for writ of certiorari; (7)

the proceedings on remand; and (8) the presentation of the motion for attorney's fees.  (*See*

Comdata's Memorandum in Support of Motion for an Award of Attorneys' Fees, filed May 12,

2006 (dkt. no. 722) ("Comdata Mem."), at 4-5.)[15]

The Plaintiffs submit—and this court agrees—that under Utah law, "[w]hether a party is

the "prevailing party" depends not on the outcome of particular stages of a dispute, but instead

turns on the outcome of the entire dispute, such as an appeal that is followed by a remand."

(Pltfs' Resp. Mem. at 4.)  Here, as a consequence of the court of appeals' ruling in *Flying J Inc.*,

Comdata has emerged as the "prevailing party" in this litigation, that is, the party who is entitled

to entry of judgment in its favor.  *See A.K. & R. Whipple Plumbing and Heating v. Guy*, 2004 UT

47, 94 P.3d 270 (discussing "flexible and reasoned" approach to identifying the "successful" or

"prevailing" party); *Mountain States Broadcasting Co. v. Neale*, 783 P.2d 551, 555-56 & n.7

---

[15]Curiously, both Comdata's motion (dkt. no. 721) and the conclusion found at page 12 of Comdata's memorandum ask for a total fee award of **$1,026,806.00**, reflecting a difference of **$32,114.50**—an amount identical to that invoiced to Comdata for consulting fees and expenses pertaining to appellate "moot court" rehearsals held in September of 2004, discussed in greater detail below.  (*See* Comdata Mem. at 9, 12.)

(Utah Ct. App. 1989) (same).[16]

Plaintiffs argue that Comdata plainly did not prevail from the inception of the plaintiffs'
enforcement proceeding through the entry of Judge Kimball's September 25, 2003 Order and the
subsequent efforts to fashion a Preliminary Development Agreement in compliance with the
September 25, 2003 Order.  Thus, plaintiffs submit, the **$412,886.50** in attorney's fees incurred
by Comdata during the first two phases of the enforcement proceeding (including Comdata's
unsuccessful motion for summary judgment) do not represent fees "attributable to the successful
vindication of contractual rights," *Stacey Props. v. Wixen*, 766 P.2d 1080, 1084 (Utah Ct. App.
1988), on the part of Comdata.

_____

[16]Yet under Utah law, the fact that a party may ultimately "prevail" in litigation does not necessarily entitle that
party to recover all of its attorney's fees incurred from the outset of the litigation.  In *Cache County v. Beus*, 2005 UT
App 204, 128 P.3d 63, the court overturned an award of attorney's fees incurred by the plaintiff, Cache County, in
pursuing an *unsuccessful* motion and appeal during the course of the litigation of a lease dispute—a dispute in which the
plaintiff ultimately obtained a favorable result:

> ¶ 16  It does not follow, however, that Cache County is entitled to recover all of its attorney
> fees and court costs. "If attorney fees are recoverable by contract, '[a] party is entitled only to those
> fees attributable to the successful vindication of contractual rights....'" *Stacey Props. v. Wixen*, 766
> P.2d 1080, 1084 (Utah Ct. App. 1988) (emphasis added) (first alteration in original) (citation omitted);
> *see also ProMax Dev. Corp. v. Raile*, 2000 UT 4,¶ 32, 998 P.2d 254 (awarding fees to defendants as
> the "successful party" in the trial court and on appeal, but denying fees accrued in pursuing an
> unsuccessful motion to dismiss); *Valcarce v. Fitzgerald*, 961 P.2d 305, 318 (Utah 1998) (holding that
> the trial court erred in awarding a defendant and certain intervenors the full amount of their requested
> attorney fees without recognizing that some of the time charged by their counsel was spent on
> unsuccessful issues); *Paul Mueller Co. v. Cache Valley Dairy Ass'n*, 657 P.2d 1279, 1288 (Utah 1982)
> ("Because the counterclaim was unsuccessful, the hours spent in the prosecution thereof are
> noncompensable.").
>
> ¶ 17 Here, the trial court awarded Cache County all of its attorney fees and court costs from
> the inception of the case, despite the fact that only a portion of those fees and costs were "'attributable
> to the successful vindication of contractual rights.'"  *Stacey Props.*, 766 P.2d at 1084 (emphasis added)
> (citation omitted).  Namely, Cache County's motion for summary judgment was unsuccessful. *See
> Cache County I*, 1999 UT App 134 at ¶ 41, 978 P.2d 1043 (reversing the entry of summary judgment
> in favor of Cache County).  Cache County was also unsuccessful on appeal in *Cache County I*, *see id.*
> at ¶ 42, and nothing since then has changed the propriety of that ruling.  Quite simply, in awarding
> Cache County all of its attorney fees and court costs from the inception of the case, the trial court did
> not consider whether such fees and costs were "'attributable to the *successful* vindication of
> contractual rights.'"  *Stacey Props.*, 766 P.2d at 1084 (emphasis added) (citation omitted).

2005 UT App 204, ¶¶ 16-17, 128 P.3d at 69-70 (footnote omitted).

As noted above, Comdata did prevail in substantial part on its May 20, 2004 motion to clarify Judge Kimball's September 25, 2003 Order, for which it now claims **$185,998.00** in attorney's fees.  And of course, Comdata prevailed on direct appeal of the September 25, 2003 Order to the Tenth Circuit, for which it now claims **$336,608.50** in attorney's fees.  Having prevailed before the three-judge panel in *Flying J* in April 2005, Comdata successfully defended the panel's ruling against the plaintiffs' request for panel rehearing and rehearing *en banc*, for which it now claims **$35,239.00** in attorney's fees, and the plaintiffs' petition for a writ of certiorari, for which Comdata seeks **$54,647.00** in attorney's fees.

Comdata also seeks **$27,644.50** in attorney's fees for work performed after remand of the proceeding to this court, as well as a relatively modest sum of **$5,897.00** in attorney's fees incurred in the preparation of the current motion for an award of attorney's fees through May 5, 2006.

### D.  The Plaintiffs' Objections to Comdata's Request

The plaintiffs first argue that "the Court should deny or substantially reduce that request either because such an award is inequitable under the circumstances of the case . . . ."  (Pltfs' Resp. Mem. at 4.)

> When, as here, the parties prevailed at different stages of litigation and the point of controversy centered around a term in the settlement agreement determined to be ambiguous, neither Comdata nor Plaintiffs should recover all of their attorneys' fees relating to this proceeding.  Instead, if the Court does not wait until this enforcement proceeding is concluded, it should hold that it is more appropriate for the parties' attorneys' fees claims to offset each other at this stage.

(*Id.* at 5-6.)  They also contend that "Comdata's claim for over one million dollars in attorney's fees here reflects inefficient over-lawyering and is not 'reasonable.'" (*Id.* at 6.)

> Under Utah law, which governs the fee-shifting provision of the Settlement Agreement here, the mere fact that a contract provides for the recovery of attorneys' fees does not mean that the trial court should simply award the full amount billed by the requesting party's attorneys. *See Dixie State Bank v. Bracken*, 764 P.2d 985, 990 (Utah 1988).

(*Id.*)

Relying on the factors enumerated in *Dixie State Bank*, the plaintiffs challenge the

reasonableness of the 3,000-plus hours expended by defendants' attorneys in defense of the

plaintiffs' motion to enforce the settlement agreement:

> In considering whether a fee is unreasonable or excessive under Utah law, a court should apply a four-prong test: (1) What legal work was actually done? (2) How much of the work was reasonably necessary to adequately prosecute the matter? (3) Is the attorney's billing rate consistent with the rates customarily charged in the locality for similar services? (4) Are there circumstances which require consideration of additional factors? . . . Additionally, a court can consider, among other things, the difficulty of the litigation, the efficiency of the attorneys in presenting the case, the number of hours spent on the case, the amount involved in the case and the results attained, and the expertise and experience of the attorneys involved. *See Dixie State Bank*, 764 P.2d at 989-90.

(*Id.* (citing *Mark Technologies. Corp. v. Utah Res. Int'l, Inc.*, 2006 U.S. Dist. LEXIS 25989 at

*3-*6, 2006 WL 1073559 (D. Utah April 20, 2006) (Judge Kimball), and *Dixie State Bank v.

Bracken*, 764 P.2d 985, 990 (Utah 1988)).)   "Here," the plaintiffs continue, "Comdata's team

consisted of a large group of lawyers."   (*Id.* at 7.)

> The Morgan Lewis firm shows significant time by the following lawyers (as well as two paralegals) in the approximately 3,153 hours logged for this matter that are shown on its Exhibits B-1 (3,053.6 hours) and B-2 (99.6 hours):
>
> • Gordon Cooney (partner: ~ 1,106 hours);
> • Daffodil Tyminski (associate: ~ 962 hours);
> • Timothy Mygatt (associate: ~ 767 hours);
> • Peter Buscemi (partner: ~ 80 hours);
> • Michael Pillion (partner: ~ 31 hours);
> • Lauren Shank (associate: ~ 29 hours)

> In addition, John Bogart of the Bendinger (now Howrey) firm in Salt Lake
> City provided substantial assistance, logging approximately 400 hours.

(*Id.* at 8.)  They complain that "[r]oughly one-third to one-half of the time entries of these

lawyers on Exhibits B-1, B-2, C-1, and C-2 show them speaking with, and writing memos to,

each other about this case. . . .  Most of the time entries indicate some sort of internal conference.

Because of the block billing . . . it is not possible to separate these internal conferences from

other work reflected in the time entries."  (*Id.*)  In the plaintiff's view, "[t]he fact that Comdata

chose to use a large, inefficient team, who spent a large portion of their time just talking with and

writing emails and memos to each other, supports reducing its claim for attorneys' fees by at least

33% to 50% just for this reason."  (*Id.*)

Plaintiffs also argue that Comdata's fee documentation reflects significant "block billing"

of attorney time:

> When, as here, counsel fails to allocate the time spent among each of many
> different tasks – the practice known as "block billing" – it is appropriate for the
> court simply to reduce the entire claim for attorneys' fees in order to adjust for
> inefficiency.  In *Robinson v. City of Edmond*, 160 F.3d 1275, 1284 (10th Cir.
> 1998), the Tenth Circuit explained: "The use of billing practices that camouflage
> the work a lawyer does naturally and quite correctly raise suspicions about
> whether all the work claimed was actually accomplished or whether it was
> necessary.  This concern is particularly important in a situation where a party is
> seeking to have his opponent pay for his own lawyer's work." To address block
> billing: "[A] district court may discount requested attorney hours if the attorney
> fails to keep 'meticulous, contemporaneous records' that reveal 'all hours for
> which compensation is requested and how those hours were allotted to specific
> tasks.'"(quoting *Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir. 1983)).

(*Id.* at 9.)  To address the problem of block billing, plaintiffs submit that "some courts simply

apply a percentage reduction to the claimed fees."  (*Id.* (citing *Okla. Natural Gas Co. v.*

*Apache Corp.*, 355 F. Supp. 2d 1246, 1264-65 (N.D. Okla. 2004) (reducing fee claim by 15% for

block billing)).)

Plaintiffs further argue that Comdata's fees are excessive when compared with the fees of plaintiffs' counsel incurred in relation to the same proceeding.  (*Id.* at 10-11, 13-14.)

The plaintiffs also offer a more detailed critique of Comdata's fees claimed for specific phases of the proceeding.

### (1) Comdata's Defense of the Enforcement Proceeding

In addition to the objections summarized above, the plaintiffs point out that nearly $97,000 of the $258,000 requested by Comdata in relation to the proceedings before Judge Kimball were incurred in the preparation and presentation of Comdata's "ill-advised summary judgment motion, which Judge Kimball denied in light of disputed facts, . . ."  (Plts' Resp. Mem. at 11.)   The requested fees represent a cost of "approximately $1,155 per page of briefing," according to the plaintiffs, and reflect "the lack of efficiency and overlawyering evident from the time entries by Comdata's counsel."  (*Id.* at 12.)  They also complain that Comdata's counsel ostensibly spent over 285 hours (approximately $89,000 in fees) preparing for and attending "an 8 hour evidentiary hearing," including time spent observing the hearing itself.  (*Id.* at 12-13.) The hours seem excessive, plaintiffs submit, particularly where Judge Kimball had required the parties to exchange their witnesses' direct testimony in writing in advance of the hearing.  (*Id.* at 13.)

### (2) Implementation of the September 25, 2003 Order

The plaintiffs contend that Comdata's fees for the preparation of a Preliminary Development Agreement in compliance with Judge Kimball's September 25, 2003 Order should be denied because that work would be governed by the Trendar License, not the Settlement

Agreement, and the Trendar License does not provide for an award of attorney's fees.  (*Id.* at 14-15.)  But this court has already determined that all of Comdata's pending attorney's fees requests are governed by Section 12 of the parties' Settlement Agreement.

### (3) Comdata's Motion to Clarify

Plaintiffs argue that "Comdata's claim for more than $185,000 for a motion to clarify Judge Kimball's September 25, 2003 ruling again reflects enormous inefficiency and overbilling on a matter in which Comdata should not be treated as the 'prevailing party.' . . . [T]he sheer magnitude of Comdata's claim for fees in this category," *viz.*, $185,000, "demonstrates the inefficiency and overlawyering by Comdata's counsel." (*Id.* at 15.)  In plaintiffs' view,

> The Court should disallow this category entirely, because both parties prevailed on issues they raised. Alternatively, it should drastically reduce the amount claimed for this category to a number that reflects the very small amount of time that it should take to have lawyers prepare two short briefs and attend a 3 hour oral argument.

(*Id.* at 17.)

The outcome of Comdata's motion to clarify, etc., was indeed mixed: plaintiffs prevailed on one issue, Comdata prevailed on another issue, a special master was appointed as Comdata asked, and after additional discovery, Comdata ultimately did not pursue its request for a stay of the proceedings pending appeal.  And plaintiffs correctly point out that Comdata now claims nearly as much in attorney's fees for work on the motion to clarify as it did for work done in the entire first phase of the proceeding up to the September 25, 2003 Order, that is, $185,000 vs. $258,000, and nearly twice that awarded by Judge Kimball for work performed by plaintiffs' counsel in the entire first phase, *viz.*, $107,000.

-27-

### (4) The Tenth Circuit Appeal

The plaintiffs object to Comdata's reference to comments made during the court of mediation proceedings at the court of appeals level in spite of the confidentiality requirements of Tenth Circuit Rule 33.1(D).  (*Id.* at 17-18.)  They also argue that Comdata's request for **$336,608** "just for preparing two appeal briefs and presenting oral argument" for thirty minutes is excessive, because "[p]reparing appeal briefs and arguing an appeal should not cost more than litigation of the underlying issue being appealed"—certainly not $2,930 per page for an opening brief and $2,125 per page for a reply brief— and the attorneys' time entries reflect extensive interaction between those who were working on the appeal.  (*Id.* at 18.)  Plaintiffs also point out that "Comdata cites no authority for taxing to its adversary the $32,114.50 cost of paying a retired judge to listen to practice versions of its argument."  (*Id.*)

### (5) Rehearing and Certiorari Petitions

The plaintiffs argue that Comdata's briefs in opposition to plaintiffs' petition for rehearing at the court of appeals and petition for certiorari filed with the Supreme Court cost $2,333 per page and $2,529 per page, respectively, and that the requested $35,000 and $55,647 fee amounts should be reduced to not more than $12,500 and $20,000, respectively.  (*Id.* at 19.)

### (6) Proceedings After Remand

The plaintiffs submit that the tasks undertaken by Comdata's counsel since remand of this matter by the court of appeals "were not difficult and should not have been time-consuming," and should be worth not more than $6,000.  (*Id.* at 20.)

### E.   Analysis of Comdata's Request

As summarized above, courts determine what is a reasonable fee by first figuring a

"lodestar" amount and then adjusting that figure based on facts specific to the case. *Blum v. Stenson*, 465 U.S. 886, 888 (1984).[17]

> Under *Dixie State Bank*,
>
> a court should begin its fee analysis by determining exactly what legal work the petitioning attorney or attorneys performed, both in terms of the nature of the work and the time spent in its performance. *Id.* at 990.  Second, the court should consider how much of that work was reasonably necessary to adequately conclude the matter for which legal representation had been sought. *Id.*  Third, the petitioning attorney's billing rate should be compared with those "customarily charged in the locality for similar services," to ensure the reasonableness of the attorney's rate. *Id.*  After consideration of these first three criteria, a trial court can establish a preliminary fee by multiplying the number of necessary hours of legal work performed by the appropriate hourly rate.

*Matter of Estate of Quinn*, 830 P.2d 282, 285 (Utah Ct. App. 1992) (citing *Dixie State Bank*, 764 P.2d at 990).  "Finally, after the preliminary fee is established, *Dixie*'s fourth step asks that courts adjust the amount of that fee, when necessary, to reflect the court's consideration of various criteria set forth in" the Utah Rules of Professional Conduct, including

> the novelty and complexity of the issues involved; the likelihood that the representation will preclude the lawyer or lawyers from accepting other employment; the expertise, experience, and reputation of the lawyer or lawyers; the amount involved and results obtained; the time limitations imposed by the client or the circumstances; the length and nature of the attorney-client relationship; and whether the requested fee is fixed or contingent.

*Id.* (citing Rule 1.5. Utah Rules of Professional Conduct and Utah Code of Professional

---

[17]   The proper procedure for determining a reasonable attorneys' fee is to arrive at a lodestar figure by multiplying the hours . . . counsel reasonably spent on the litigation by a reasonable hourly rate. *Case v. Unified School Dist. No. 233, Johnson County*, 157 F.3d 1243, 1249 (10th Cir. 1998).  The fee applicant should exercise billing judgment with respect to the number of hours worked and billed. *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).  Billing judgment consists of winnowing hours actually expended down to hours reasonably expended.  *Case*, 157 F.3d at 1250.

*Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1257 (10th Cir. 2005).

-29-

Responsibility DR 2-106).

### (1) Overstaffing and Inefficiency

The plaintiffs assert that "Comdata's team consisted of a large group of lawyers," though by their own tabulation, 2,835 of the 3,153 hours claimed by the Morgan Lewis firm—nearly 90 percent of the total—were logged by one partner (Mr. Cooney, 1,106 hours) and two litigation associates (Ms. Tyminski, 962 hours, and Mr. Mygatt, 767 hours), with an additional 400 hours logged by Comdata's local counsel, Mr. Bogart from June of 2002 through May of 2006.  (Pltfs' Resp. Mem. at 7-8.)  They argue that Comdata's employment of this "large, inefficient team, who spent a large portion of their time just talking with and writing emails and memos to each other, supports reducing its claim for attorneys' fees by at least 33% to 50% just for this reason."  (*Id.* at 8.)

Having reviewed Comdata's attorney billing memoranda and the docket in this proceeding with some care, and having heard counsel's direct testimony concerning the staffing of the work performed, this court is *not* persuaded that Comdata's counsel overstaffed its defense of the plaintiffs' enforcement proceeding or its subsequent appeal, needlessly duplicating the legal services provided, as plaintiffs suggest.  Given the nature of the subject matter of the proceeding and the significant dollar amount that the plaintiffs contended was at stake, detailing one partner and two associate attorneys to carry 90 percent of the workload, coupled with the able assistance of local counsel as to some tasks, appears to have been reasonable.

### (2) "Block Billing" of Attorney's Fees

At the same time, the court finds some merit in the plaintiffs' objections to Comdata's "block billing" of attorney time on various tasks, which renders the task of evaluating the

reasonableness of the time expended on a particular task that much more difficult.

> The term "block billing" refers to "the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1554 n.15 (10th Cir.), *cert. denied*, 519 U.S. 928 (1996).

*Robinson v. City of Edmond*, 160 F.3d 1275, 1284 n.9 (10th Cir. 1998).  In *Ramos*, the Tenth Circuit seemingly discouraged the practice of block billing, because block billing does not precisely delineate "how . . . hours were allotted to specific tasks," for which *Ramos* demands "meticulous, contemporaneous time records."  *Ramos*, 713 F.2d at 553;[18] *see Robinson,* 160 F.3d at 1281 ("[A] district court *may* discount requested attorney hours if the attorney fails to keep 'meticulous, contemporaneous records' that reveal 'all hours for which compensation is requested and how those hours were allotted to specific tasks.'" (emphasis added) (quoting *Ramos*, 713 F.2d at 553)).[19]

Comdata replies that "block billing" is not *per se* impermissible in the Tenth Circuit, citing *Cadena v. Pacesetter Corp.*, 224 F.3d 1203 (10th Cir. 2000).  (Comdata's Reply

---

[18]*Ramos* observed that if lawyers intend to seek an award of attorney's fees, they "must keep meticulous, contemporaneous time records to present to the court upon request. These records must reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and *how those hours were allotted to specific tasks*—for example, how many hours were spent researching, how many interviewing the client, how many drafting the complaint, and so on."  713 F.2d at 553 (emphasis added).

[19]As the court of appeals explained in *Robinson*:

> The use of billing practices that camouflage the work a lawyer does naturally and quite correctly raise suspicions about whether all the work claimed was actually accomplished or whether it was necessary. This concern is particularly important in a situation where a party is seeking to have his opponent pay for his own lawyer's work.  As we noted in *Jane L.* [*v. Bangerter*, 61 F.3d 1505, 1509 (10th Cir. 1995)], a district court does not abuse its discretion in reducing a plaintiff's fee request when the request is based on time records that are "rather sloppy and imprecise."  *Jane L.*, 61 F.3d at 1510.  We have always required lawyers to keep "meticulous time records that 'reveal . . . all hours for which compensation is requested and how those hours were allotted to specific tasks.'"  *Id.* (quoting *Ramos*, 713 F.2d at 553).

160 F.3d 1275, 1284-85 (10th Cir. 1998).

Memorandum in Support of Motion for an Award of Attorney's Fees, filed June 19, 2006 (dkt. no. 733) ("Comdata Reply Mem."), at 11.)  *Cadena* observed that "this court has not established a rule mandating reduction or denial of a fee request if the prevailing party submits attorney-records which reflect block billing," 224 F.3d at 1215, but signaled no retreat from the degree of specificity demanded by *Ramos* and *Robinson*.  The *Cadena* panel was satisfied that the time records submitted in that case "sufficiently allowed the court to determine the time allotted by her attorneys to specific tasks and the reasonableness of that time" under the standard articulated in *Ramos.  Id.*

Here, the billing memoranda annexed as exhibits to Comdata's memorandum reflect classic "block billing":

| | | | | |
|---|---|---|---|---|
| **2/20/2003** | **J. GORDON COONEY** | **11.50** | **$5,175.00** | **Outside conferences with M. Sheridan, C. Laird, S. Graybill re: preparation for March hearing, revisions to declaration, revisions to motion for summary judgement and strategy, teleconferences with D. Tyminski re: filings.** |

While single daily entries of this kind may serve to streamline the billing process, the judicial process of evaluating the reasonableness of the requested fees in light of *Ramos* and *Dixie State Bank* would be better served if Comdata's counsel had distinguished between the time spent on specific tasks (*e.g.*, drafting, editing or reviewing a document), and the time spent on the same day conferring or corresponding with other attorneys.  Here, attorney conferences and telephone calls are routinely aggregated with document drafting and other legal tasks into single time entries covering several hours in a single day.  For example:

| 1/19/2004 | J Gordon Cooney | 4.00 | $1,800.00 | Revise Tenth Circuit brief and appendix; conferences in office with D Tyminsky and T. Mygatt re: brief and appendix. |
|-----------|-----------------|------|-----------|------------------------------------------------------------------------------------------------------------------------|
| 1/19/2004 | J Gordon Cooney | 2.50 | $1,125.00 | Revise Tenth Circuit brief and appendix. |
| 1/19/2004 | Timothy D. Mygatt | 7.50 | $1,200.00 | Review and revise appellate brief; review and revise joint appendix; numerous conferences with G. Cooney and D. Tyminski re: same. |
| 1/19/2004 | Peter Buscemi | 4.70 | $2,585.00 | Review and revise latest draft of Tenth Circuit brief. |
| 1/19/2004 | P. Daffodil Tyminski | 7.20 | $1,728.00 | Revise brief; conferences with G. Cooney and T. Mygatt re: brief, docket and appendix; edit brief per G. Cooney's comments |

Of the 25.9 hours of attorney time ($8,438.00) reported for one day in these entries, how much time was spent in conference and how much was expended on actually drafting, assembling or editing the appellate brief and appendix?  Clearly, at least 7.2 hours was spent on revising the brief, but beyond that, who knows?

Many of the time entries set forth in Comdata's exhibits—between one-third and one-half of all entries, according to the plaintiffs—reflect the block billing of attorney conferences, phone calls and written communications with other legal tasks performed by each attorney on the same date.  The proportion of the total attorney *time* reported by Comdata's counsel that consists of conferences and communications between attorneys, in contrast to the performance of other legal tasks, necessarily remains unclear, but plaintiffs assert that it was "a large portion of their time," and that Comdata's fee request should be reduced for that reason.  (Pltfs' Resp. Mem. at 8.)

-33-

The "block billing" of attorney conferences and internal communications in this case often obscures the actual amount of attorney time spent on other tasks, thus complicating the court's essential inquiry into whether the time expended on each task was "necessary," or was excessive or duplicative. *See, e.g., Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 538, 543 (10th Cir. 2000) ("[W]hen examining an attorney's fee claim, the district court should examine the hours spent on each task to determine the reasonableness of the hours reported.").[20]

This is not to say that billing for conferences between attorneys working on the same task is *per se* unreasonable or excessive. To the contrary, as Mr. Marsden testified, effective trial and appellate advocacy often requires a collaborative effort. But greater clarity in allocating time between attorney conferences and other tasks would better assist the court in evaluating the reasonableness of requiring an opposing party to pay over $8,000 for the nearly 26 hours reported by four lawyers working on a single day. *Cf. Ramos*, 713 F.2d at 554 ("Another factor the court should examine in determining the reasonableness of hours expended is the potential duplication of services. . . . [I]f the same task is performed by more than one lawyer, multiple compensation should be denied.").[21]

---

[20]The reasonableness inquiry into the hours expended by the prevailing party's attorneys

is controlled by the overriding consideration of whether the attorney's hours were "necessary" under the circumstances. "The prevailing party must make a 'good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary.'" *Jane L.*, 61 F.3d at 1510 (quoting *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933). A district court should approach this reasonableness inquiry "much as a senior partner in a private law firm would review the reports of subordinate attorneys when billing clients...." *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983).

*Robinson*, 160 F.3d at 1281.

[21]In examining the time entries made by Comdata's counsel, the court did discern that some billing judgment likely was exercised with reference to attorney conferences: while some conferences are reflected in the respective time entries of all the named participants, in a number of other instances, only one attorney's time was actually billed for the conference, thus reducing the total cost of that conference time to their client, and ultimately, to the plaintiffs.

-34-

### (3) Comparison of Plaintiffs' and Comdata's Total Fees

The plaintiffs argue that the inefficient effort and excessive accrual of fees by Comdata's counsel is further evidenced by the difference between the amount claimed by plaintiffs' counsel during the initial phase of the enforcement proceeding and the amount of fees now requested by Comdata for that same period, *viz.*, **$107,277.22** vs. **$258,707.50**.  (Pltfs' Resp. Mem. at 10.) "This comparison," plaintiffs submit, "illustrates the inefficient over-lawyering by Comdata's counsel," (*id.*), a pattern that continues through the course of the litigation from May 2002 through April 2006, with plaintiffs' counsel billing a total of **$488,505**, or 47.6 percent of the **$1,026,806** now requested by Comdata's counsel for the same period.  (*Id.* at 14.)

"Evidence of the hours expended by opposing counsel may be helpful in determining whether time expended on a case was reasonable," *Shaw*, 213 F.3d at 543, but the opponent's time is not an "immutable yardstick of reasonableness."  *Robinson v. City of Edmond*, 160 F.3d 1275, 1284 (10th Cir.1998) (reviewing attorney's fees award under 42 U.S.C. § 1988).

Plainly, plaintiffs' counsel used a more conservative approach to the attorney time expended and billed for the work performed in prosecuting the motion to enforce the Settlement Agreement before the district court and to defend Judge Kimball's September 25, 2003 Order on direct appeal.  Even so, the plaintiffs' attorneys aggressively pursued a very favorable reading of Article 4.2 of the Trendar License that ultimately proved to not be sustainable on appeal—a reading that the plaintiffs believed would grant them plenary access to merchants who would not otherwise consent to process TCH proprietary card transactions and in the interim would entitle the plaintiffs to recover many millions of dollars in compensatory damages from Comdata.

The Tenth Circuit has long accepted the proposition that one of the factors useful

in evaluating the reasonableness of the number of attorney hours in a fee request is "the responses necessitated by the maneuvering of the other side." *Ramos*, 713 F.2d at 554.  The Supreme Court has also recognized that part of an attorney's calculus of the amount of time reasonably necessary for a case is the vigor which the opponents bring to the dispute.  *See City of Riverside v. Rivera*, 477 U.S. 561, 580 n. 11, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (plurality opinion) ("'The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response.'") (quoting *Copeland v. Marshall*, 641 F.2d 880, 904 (D.C.Cir. 1980)); *see also* 2 Mary Francis Derfner & Arthur D. Wolf, *Court Awarded Attorney Fees*, ¶ 16.02[8][b] (1997) (discussing cases that have held "the vehemence or tenacity of the opposition will justify an increase in the amount of time an attorney must necessarily-and therefore reasonably-spend in countering the opposition and winning the suit").

*Robinson*, 160 F.3d at 1284.  "An aggressive litigation strategy carries with it certain risks, one of which is that a party pursuing an aggressive strategy may, if it loses, find itself required to bear a portion of the attorneys' fees incurred by the other party in responding to that aggressiveness." *Praseuth v. Rubbermaid, Inc.*, 406 F.3d at 1260.

Comdata insists that the attorney time invested in the defense of the plaintiffs' enforcement proceeding was necessitated by the plaintiffs' aggressiveness in pursuing their reading of Article 4.2 and by the enormous economic loss to Comdata that would likely result if the plaintiffs were ultimately to prevail; "The reasonableness of Comdata's fees thus must be viewed not only in light of the scope of required activities but also in light of what was allegedly at stake," and "cannot be considered unreasonable in light of plaintiffs' claimed damages and the protracted litigation that took place to resolve this matter."  (Comdata Reply Mem. at 2, 3 (citations omitted).)

Given the magnitude of what Comdata's counsel believed to be at stake in the plaintiffs' enforcement proceeding, it does not appear unreasonable to detail one experienced litigation partner and two litigation associates to spend considerable time and energy on Comdata's

defense over a period of several years, both before this court and the court of appeals, and assisted to a limited degree at various points by other attorneys and experienced local counsel who assisted with specific litigation tasks.

Moreover, it is hard to argue with success.  The fact is that Comdata's counsel ultimately prevailed in this proceeding, and the plaintiffs' counsel did not.  The outcome itself suggests that Comdata correctly invested the necessary litigation resources in its defense, while the plaintiffs somehow fell short of their own goal.  The fact that it cost more to win the day than it did to lose does not indicate that "more" was either unreasonable or excessive.

### (4) Relation Between Time Expended and the Relief Obtained

*Hensley* instructed that an attorney's fee award should be determined in part by examining "the significance of the overall relief obtained . . . in relation to the hours reasonably expended on the litigation."  *Hensley*, 461 U.S. at 435.  Comdata emphasizes that the work for which fees are sought was performed in the successful defense of claims that the plaintiffs believed were worth as much as $131 million in damages that would have accrued between 2003 and 2006, absent the affirmative relief then demanded by the plaintiffs.  (*See* Tr. 9/14/06, at 7:6-8:1 (testimony of Christine Laird).)  By fully prevailing in their defense of the plaintiffs' claims, Comdata's counsel wholly exonerated their client from the risk of that significant potential liability.  Here, the significance of the overall relief obtained in relation to the hours reasonably expended on the litigation appears to be considerable, and supports the requested award of fees.[22]

---

[22]The amount in controversy and the amount of any actual recovery of damages may also be taken into consideration under Utah law:

Although the Utah Supreme Court cautions against basing reasonableness determinations on the amount in controversy or amount actually recovered, *see Dixie State Bank*, 764 P.2d at 990, the trial

(continued...)

-37-

### (5) Detailed Examination of Hours Claimed

In the end, the court's essential reasonableness inquiry cannot be short-circuited by one or more generalized assertions about the amount of the fees requested.  A global comparison of total fees billed or a tally of the number of attorney conferences over a five-year period cannot take the place of examining the particular hours claimed to have been spent on specific legal tasks and evaluating whether in light of the record in this case, those hours appear to have been "reasonably expended."  *Robinson*, 160 F.3d at 1281; *Hensley*, 461 U.S. at 433; *Phelps v. Hamilton*, 120 F.3d 1126, 1131 (10th Cir. 1997).

This court has expended a number of hours examining the billing records submitted by Comdata's counsel in support of their fee request, doing so in some detail.  The court has also reviewed the docket and the various motions, memoranda and other papers submitted by counsel during the time that Judge Kimball presided over this case.  And the court has heard and considered the arguments of counsel presented at the September 14, 2006 hearing and set forth in the parties' memoranda.

Based upon that examination, and taking into account the unavoidable ambiguities that result from the Comdata attorneys' persistent "block billing" of their time, this court finds that on the whole, the hours reported by Comdata's attorneys were reasonably expended in the defense of the plaintiffs' enforcement proceeding and in the prosecution of a successful appeal before the

---

[22](...continued)
court was nonetheless entitled to consider these factors in making its reasonableness determination.
*See id.* ("[A]lthough the amount in controversy can be a factor in determining a reasonable fee, care should be used in putting much reliance on this factor.").

*Moore v. Smith*, 2007 UT App 101 ¶ 54, 158 P.3d 562, 578.

Tenth Circuit.[23]  The plaintiffs have been tenacious in the pursuit of their theory under Article 4.2 of the Trendar License, both before and after the Tenth Circuit's adverse ruling in April of 2005, and Comdata's counsel have proven to be equally vigorous in their response, obtaining a favorable result for their client.

Phrased in terms of the *Dixie State Bank* factors, this court is satisfied that the legal work described in the billing memoranda of Comdata's counsel was actually performed; that for the most part, the work performed was reasonably necessary to adequately defend the matter; that the attorneys' billing rates were largely consistent with the rates customarily charged in the locality for similar services; and that this was a case that was somewhat complex because of the technical issues involved (in contrast to any need to litigate multiple claims or defenses among multiple parties).

### (a)  The Appellate "Moot Court" Rehearsals

The plaintiffs raise a specific question concerning fees and costs incurred by Comdata through the participation of its counsel in "moot court" rehearsals of their oral appellate arguments prior to the September 30, 2004 hearing before the Tenth Circuit.  Comdata seeks reimbursement both for the time spent by Mr. Cooney and others in preparing and presenting their "moot court" arguments on September 2 and 25, 2004, and for the **$32,538.72**  fee charged by their consultant, retired Third Circuit Judge Arlin M. Adams and his associates, for their participation in those moot court sessions as reflected in their invoice for services.

---

[23]The court's conclusion is buttressed by the fact that Comdata's expert, Mr. Marsden, reached essentially the same conclusion after a similar *post hoc* examination of the record materials.  The plaintiffs offered no expert testimony in rebuttal of Marsden's analysis, and plaintiffs' cross-examination of Marsden dealt largely with generalities about whether attorneys sometimes do more legal work than is necessary for a particular matter.  Marsden acknowledged that sometimes they do.  (*See* Tr. 9/14/06, at 76:9-81:5.)

Evaluation of the time expended by counsel in preparing for the moot court arguments is complicated somewhat by Comdata counsel's practice of "block billing" the daily time entries of each timekeeper, making it difficult to distinguish the actual time spent preparing and presenting the moot court arguments from the time spent on other preparations for arguing the case before the Tenth Circuit.

The Tenth Circuit has not yet explicitly addressed the compensability of attorney time spent in "moot court" oral argument rehearsals under statutory or contractual attorney's fees provisions, or the fees charged by moot court consultants participating in the rehearsal sessions.

In *Maldonado v. Houstoun*, 256 F.3d 181 (3d Cir. 2001), the Third Circuit explained:

> A reasonable fee for hours spent preparing for a legal argument should be limited to hours reasonably necessary for a lawyer to become familiarized with the facts and the law pertaining to the issue to be argued, an analysis of the opponent's argument, and questions anticipated to be posed by the court. Under the fee shifting statute, the losing party is expected to pay for hours reasonably spent in the argument and its preparation, but not for excessive hours, or hours spent in learning or excessively rehearsing appellate advocacy.

256 F.3d at 187 (emphasis added).  In *Planned Parenthood of Cent. New Jersey v. Attorney General of State of New Jersey*, 297 F.3d 253 (3d Cir. 2002), the Third Circuit applied that standard to "moot court" argument rehearsals:

> Under *Maldonado*, time spent rehearsing oral advocacy, i.e., "moot court," may be compensated as long as the time requested is not "excessive."  The District Court made no mention of *Maldonado*, deciding instead that it could find no reason why these hours were "unreasonable" or "unnecessary."  Yet 25.5 hours of moot court time seems excessive within the meaning of *Maldonado*. Even assuming that an oral argument is 30 minutes per side, 25.5 hours would enable a lawyer to practice his argument over 50 times.  We assume that litigators have a baseline competency in oral advocacy that does not require such extensive rehearsal at the possible expense of an opposing litigant.  We will therefore vacate this award of fees, remanding to the District Court for a determination of the reasonable number of hours for which the plaintiffs may be compensated.

297 F.3d at 269.

The case law from other federal district courts concerning the compensability of "moot court" rehearsals appears to be context-driven, with mixed results. *See Moon v. Gab Kwon*, 2002 WL 31512816, at *6 (S.D.N.Y. 2002) (observing that "law firms often use mooting to prepare even the most experienced litigators for trials and oral arguments, and would be ill-advised to allow their attorneys to 'perform' in court unrehearsed; indeed, lawyers have been known to rehearse entire trials before mock juries, for similar reasons. Such time is appropriately billed to clients"); *Diamond Shamrock Exploration Co. v. Hodel*, 1991 WL 148745 (E.D. La. 1991) (finding 162 hours of preparation for district court oral argument, including conferences "research, reviewing briefs and other materials, outlining arguments, rehearsal, observation of the appellate panel, and attendance at oral argument," and 1,398 hours expended during the appellate phase to be excessive); *Baird v. Bellotti*, 616 F.Supp. 6, 8 (D. Mass. 1984) ("Preparation for oral argument required not only review of the briefs of all parties and the authorities cited therein, but review of other relevant, even tangentially relevant, authority, as well as thinking about and rehearsing the oral presentation."); *P.N. v. Clementon Bd. of Educ.*, 2007 WL 1186552, at *12 (D.N.J. 2007) (ruling that five hours billed by two lawyers "in connection with the moot court excessive in light of the limited issues on appeal"); *Majestic Box Co., Inc. v. Reliance Ins. Co. of Ill.*, 1998 WL 720463, at *5 (E.D. Pa. 1998) (finding that "the complicated nature of the defense required in this litigation justifies defendant's expenditures on the 'mock trial'"); *O'Sullivan v. City of Chicago*, 484 F.Supp.2d 829, 837 (N.D.Ill. 2007) ("The claims in this case were not so complex-indeed they were not complex at all-that an expenditure of over $14,000.00 in fees . . . for a mock trial can be deemed compensable."); *Akron Center for Reproductive Health v. City of*

*Akron*, 604 F. Supp. 1275, 1288 (N.D. Ohio 1985) (finding that the nearly 1,900 attorney hours

expended on Supreme Court appeal, including "a series of moot court arguments as a part of the

preparation for the oral argument before the Supreme Court," was excessive and reducing the

claimed amount by 30%); *Ragsdale v. Lumpkin*, 94 F.3d 647 (Table), 1996 WL 449201, *6 (7th

Cir. 1996) (ruling that four attorneys participating in two moot arguments in preparing for appeal

hearing was not excessive).

This court shares the skepticism expressed by the Third Circuit in *Maldonado* concerning

the compensability of moot court rehearsals of oral appellate arguments, particularly as to the

fees charged by moot court consultants who have not entered an appearance *as counsel* for a

party before this court or the court of appeals.  In preparing for oral argument on appeal, counsel

may indeed find it helpful to rehearse the arguments before a third party consultant with

experience in oral advocacy, just as it may prove helpful to consult various texts and guidebooks

on appellate advocacy in preparing those arguments.  Counsel may certainly decide which tools

to use in preparing for oral argument, but the expense associated with those tools should

normally be borne as part of the overhead expense component of counsel's standard billable

hourly rate rather than being shifted to an opposing party as an additional expense pursuant to a

contractual attorney's fee clause.  This court thus declines to order the plaintiffs to reimburse

Comdata or its counsel for the **$32,538.72** reflected on the invoice submitted by Schnader

Harrison Segal & Lewis LLP for the services of Judge Adams and his associates in connection

with the two moot court sessions in September of 2004;[24] this expense is not recoverable from

---

[24](*See* Exhibit B-3 to Comdata Mem.; Declaration of J. Gordon Cooney, Jr., dated May 10, 2006, annexed as
Exhibit B to Comdata Mem., at 6 ¶ 13(d)(iv).)

the plaintiffs as "reasonable attorneys' fees" within the meaning of Section 12 of the Settlement Agreement.

### (b)  Fees Incurred in "Unsuccessful" Phases

As noted above, the plaintiffs contend that Comdata should not be awarded the fees requested for time spent on Comdata's motion for summary judgment—which was denied—and its motion to clarify Judge Kimball's September 25, 2003 Order, which was granted in part and denied in part, and they suggest that language in *Cache County v. Beus*, 2005 UT App 204, 128 P.3d 63, and *Stacey Properties v. Wixen* , 766 P.2d 1080 (Utah Ct. App. 1988), may be read to support that view.

As noted above, in *Cache County v. Beus*, the Utah Court of Appeals reversed the award of all of the attorney's fees incurred by Cache County in pursuing a motion for summary judgment granted by the district court but reversed on appeal during the course of the litigation of a lease dispute—a dispute in which the county ultimately obtained a favorable result.  Citing *Stacey* for the proposition that "[i]f attorney fees are recoverable by contract, '[a] party is entitled only to those fees attributable to the successful vindication of contractual rights,'" the *Beus* court concluded that the trial court did not consider whether the fees and costs incurred in pursuing the county's motion and unsuccessful appeal were "'attributable to the successful vindication of contractual rights.'" 2005 UT App 204, ¶¶ 16-17, 128 P.3d at 69-70 (quoting *Stacey Props.*, 766 P.2d at 1084).

> Cache County's motion for summary judgment was unsuccessful.  *See Cache County I*, 1999 UT App 134 at ¶ 41, 978 P.2d 1043 (reversing the entry of summary judgment in favor of Cache County).  Cache County was also unsuccessful on appeal in *Cache County I*, *see id.* at ¶ 42, and nothing since then has changed the propriety of that ruling. . . .

*Id.* at ¶ 17.

In *Stacey*, the Utah Court of Appeals reversed the trial court's denial of attorney's fees to a party who had successfully defended one claim and had prevailed on some but not all of its own counterclaims: "Golwix was not only successful in its opposition to acceleration of the note, it was also successful on some of its counterclaims. Therefore, even with partial success, Golwix was entitled to attorney fees for the claims on which it was successful." 766 P.2d at 1085; *see also Trayner v. Cushing*, 688 P.2d 856, 858 (Utah 1984). *Stacey* thus addressed the familiar circumstance in which the party requesting fees had prevailed on some but not all of its claims. *See also Robinson*, 160 F.3d at 1283 ("There is no doubt that a district court may reduce a lodestar calculation on the grounds that a prevailing party has achieved only partial success. *See Hensley*, 461 U.S. at 436-37, 103 S. Ct. 1933; *Jane L.*, 61 F.3d at 1510. . . .").

In contrast to the experience of Cache County, Comdata filed and argued a motion for summary judgment addressing the construction of Article 4.2 of the Trendar License; that motion was denied by Judge Kimball, but Comdata ultimately prevailed on appeal, persuading the Tenth Circuit that Judge Kimball's ruling concerning the construction of Article 4.2 was clearly erroneous. *See Flying J Inc.*, 405 F.3d at 839.

As the Utah Supreme Court has explained, "The purpose of a provision for attorney's fees is to indemnify the . . . prevailing party against the necessity of *paying an attorney's fee* and to enable him to recover the full amount of the obligation," or otherwise vindicate his rights under the contract. *Management Services Corp. v. Development Associates*, 617 P.2d 406, 409 (Utah 1980) (emphasis added). *Management Services* "adopt[ed] the rule of law that a provision for payment of attorney's fees in a contract includes attorney's fees incurred by the prevailing party

-44-

on appeal as well as at trial, if the action is brought to enforce the contract." *Id.*

As our own court of appeals reminds us, "a court should focus on the 'significance of the overall relief' that the prevailing party has won: 'The result is what matters.'" *Robinson*, 160 F.3d at 1283 (quoting *Hensley*, 461 U.S. at 435).

In this case, Comdata clearly prevailed in its defense of the plaintiffs' enforcement proceeding, a successful result uncluttered by the failure of other discrete claims or counterclaims. Section 12 of the Settlement Agreement operates to indemnify Comdata "against the necessity of paying an attorney's fee." While Comdata did not prevail in the initial phase of the proceeding, its counsel made the evidentiary record upon which the court of appeals footed its ruling in Comdata's favor.[25] The attorney's fees incurred by Comdata in vindicating its rights under the terms of that agreement, including fees incurred in the early stages of this proceeding when the outcome appeared to be far less favorable, are thus "'attributable to the *successful* vindication of contractual rights,'" *Beus*, 2005 UT App 204, ¶ 17, 128 P.3d at 69-70, and may be recovered from the plaintiffs pursuant to Section 12.

### F. The February 11, 2004 Order Awarding Plaintiff's Attorney's Fees

On February 11, 2004, while Comdata's appeal was pending, Judge Kimball entered an Order awarding the plaintiffs $107,277.22 in attorney's fees and $1,688.92 in costs pursuant to Section 12 of the Settlement Agreement and 28 U.S.C. § 1920. (*See* Order, filed February 11,

---

[25]*See, e.g., Flying J Inc.*, 839 F.3d at 835 ("In our review of the record, Comdata produced substantial evidence indicating that it did not contemplate or intend that the Trendar License would lead to proprietary processing of TCH MasterCards at unaffiliated merchants, much less that this would be accomplished through a dual processing model."); *id.* at 839 ("The record shows that Comdata's arrangement with MasterCard followed a specific MasterCard policy for proprietary accounts, which involved unitary transactions and merchant consent. There is evidence that Flying J had reason to know that Comdata intended these limits to apply to Article 4.2. Accordingly, we hold that the district court clearly erred in finding that the parties intended Article 4.2 to require proprietary TCH MasterCard transactions at all Trendar locations, regardless of merchant consent, by any feasible means." ).

2004 (dkt. no. 653).)  Comdata now asks this court to vacate Judge Kimball's February 11, 2004

Order.  (*See* Comdata's Position Statement Regarding Matters Remaining after the Tenth

Circuit's Order Reversing and Remanding the Case, filed May 12,2006 (dkt. no. 723), at 9-12.)

The plaintiffs respond that this Court does not have jurisdiction to set aside that Order because

Comdata chose not to pursue any appeal of that Order at the time it was entered.  (Pltfs' Resp.

Mem. at 20.)  Comdata replies that this court retains jurisdiction to vacate the earlier award

where the judgment upon which it is footed has subsequently been reversed on appeal, citing

*Albert T. Smith Co. v. Albertson's, Inc.*, 826 F. Supp. 1299 (D. Utah 1993) (Greene, J.)

The court of appeals' Judgment in this case declared that the judgment of this court "is

reversed" and that "[t]he case is remanded to the United States District Court for the District of

Utah for further proceedings in accordance with the opinion of this court."  (*See* Judgment, dated

April 13, 2005, *Flying J Inc. v. Comdata Network, Inc.*, No. 03-4262 (10th Cir.), docketed in this

case as part of the court of appeals' mandate, filed August 15, 2005 (dkt. no. 702).).  The

essential footing for Judge Kimball's February 11, 2004 Order awarding "prevailing party"

attorney's fees in favor of the plaintiffs thus ceased to exist upon receipt of the court of appeals'

mandate.

Fed. R. Civ. P. 54(a) provides that orders or other forms of decision are "subject to

revision at any time before the entry of judgment adjudicating all the claims and the rights and

liabilities of all the parties."   This court observes that a final judgment determining all of the

rights and liabilities of all of the parties in accordance with the court of appeals' mandate has not

yet been entered, and this proceeding remains pending before this court on remand from the court

of appeals pursuant to the mandate.  The court agrees with Comdata that the February 11, 2004

Order may be revised in light of the court of appeals' reversal of Judge Kimball's September 25, 2003 Order granting relief in favor of the plaintiffs, and that this court possesses the jurisdiction to do so. *See Albert T. Smith Co. v. Albertson's, Inc.*, 826 F. Supp. at 1301 (citing *Engel v. Teleprompter Corp.*, 732 F.2d 1238, 1242 (5th Cir.1984)).[26]  Nothing in Riley v. Kurtz, 361 F.3d 906 (6th Cir. 2004), cited by the plaintiffs, holds to the contrary.[27]

### G.  Lodestar Amounts

As explained above,

> To determine the reasonableness of a fee request, a court must begin by calculating the so-called "lodestar amount" of a fee, and a claimant is entitled to the presumption that this lodestar amount reflects a "reasonable" fee.  *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563-65, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *Cooper v. Utah*, 894 F.2d 1169, 1171 (10th Cir. 1990).  The lodestar calculation is the product of the number of attorney hours "reasonably expended" and a "reasonable hourly rate."  *See Hensley*, 461 U.S. at 433, 103 S.Ct. 1933; *Phelps*, 120 F.3d at 1131.  "Once an applicant for a fee has carried the burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be a

---

[26]In *Engel*, the Fifth Circuit observed that

> a reversal such as that entered in this case automatically operates as a form of remand because the case is returned to the district court for entry of judgment. At that point, the district court is not limited to taking only those actions explicitly directed in our judgment and no others.  Rather, the district court is obliged to carry out the instructions we have given, and should then be presumed to be free to take any other consistent actions. The district court is not preempted from acting on a matter neither raised before nor acted upon by this court.

732 F.2d at 1241.

[27]In *Riley*, the Sixth Circuit rejected the defendant's assertion that where the court of appeals ordered a remittitur of a prevailing plaintiff's punitive damages award, the district court should have revisited, *sua sponte*, the issue of attorney's fees and reduced the plaintiff's award.  The defendant argued that "when the amount of damages was reduced, the district court should have reduced the amount of attorney's fees also."

> This argument fails to recognize that the district court's award of attorney's fees was pursuant to § 1988 and was not based on the amount of the damages, but on the fact that the plaintiff was the prevailing party and on the amount of time Mr. Manville spent litigating the case. Thus, amending the judgment did not require an amendment of the attorney's fee award..

361 F.3d at 912.  The plaintiff in *Riley* remained the prevailing party, and as the defendant had not otherwise objected to the award or sought to appeal its amount, it remained intact.  *Id.* at 912-13.

-47-

reasonable fee . . . .

*Robinson*, 160 F.3d at 1281.  Based upon the court's foregoing findings as to the hours

reasonably expended and the reasonable rates charged by Comdata's counsel, this court now

concludes that Comdata is entitled to an award of attorney's fees pursuant to Section 12 of the

parties' Settlement Agreement based upon the following lodestar amounts:

(1) Initial proceedings on plaintiffs' motion to enforce:     **$258,707.50**

(2) Implementation of the September 25, 2003 Order     **$154,179.00**

(3) Motion to clarify the September 25, 2003 Order     **$185,998.00**

(4) Appeal to the Tenth Circuit, No. 03-4262     **$304,494.00**

(5) Petitions for rehearing & rehearing *en banc*     **$ 35,239.00**

(6) Petition for a writ of certiorari     **$ 54,647.00**

(7) Proceedings after remand     **$ 27,644.50**

(8) Motion for award of attorney's fees     **$   5,897.00**

The plaintiffs correctly point out that "[c]ourts have, in extraordinary situations, declined

to award attorney fees to a prevailing party in spite of an enforceable contractual provision,"

*Cobabe v. Crawford*, 780 P.2d at 836 n.3, but they have failed to demonstrate that this

proceeding presents such an extraordinary situation.  The plaintiffs have not identified a single

instance of inequitable or unethical conduct on the part of Comdata's counsel in their defense of

the plaintiffs' enforcement proceeding, or any other ground warranting an equitable reduction of

Comdata's requested fees.

Indeed, in large part, the plaintiffs simply complain that Comdata's counsel put too much

time and effort into their successful defense of the plaintiffs' motion to enforce.  Nothing in

-48-

plaintiffs' objections has proven to be sufficient to overcome the presumption that the lodestar amounts are reasonable for the purpose of Section 12 of the parties' Settlement Agreement, and this court declines to make any additional *sua sponte* adjustments to those amounts.

**SUMMARY**

For the reasons explained above, this court concludes that Comdata's motion for an award of attorney's fees should be granted, with the exception of the consulting fees and expenses associated with the appellate "moot court" rehearsals, which has been excluded from the lodestar amount calculated for the appellate phase.  The total amount of attorney's fees to be awarded in favor of Comdata is **$1,026,806.00**—which is the total sum asked for in the conclusion of both Comdata's motion and initial memorandum, and which, unconsciously or perhaps inadvertently, already omits the claimed amount of  **$32,114.50** in  "moot court" consulting fees disallowed by this court from the aggregate sum of  **$1,058,920.50** requested in Comdata's moving papers.

This court having heretofore determined that the only issue remaining to be decided after remand was the question of attorney's fees, and that question having now been decided, it appears that this proceeding is ripe for entry of final judgment, and the Clerk of the Court should be directed forthwith to enter such judgment in favor of Comdata and against the plaintiffs in the amount of **$1,026,806.00**, together with their costs of action.

Therefore,

**IT IS ORDERED** that Comdata's Motion for an Award of Attorney's Fees, filed May 12, 2006 (dkt. no. 721), is hereby GRANTED to the extent that Comdata is awarded the sum of **$1,026,806.00**, together with its costs of action;

**IT IS FURTHER ORDERED** that consistent with the mandate of the court of appeals, the Order, filed September 25, 2003 (dkt. no. 638), is hereby VACATED;

**IT IS FURTHER ORDERED** that the Flying J Plaintiffs' Motion to Enforce May 2001 Settlement Agreement, filed May 31, 2002 (dkt. no. 573), is hereby DENIED; and

**IT IS FURTHER ORDERED** that the Order, filed February 11, 2004 (dkt. no. 653) is hereby VACATED.

**Let Judgment be entered accordingly.**

DATED this _____ day of November, 2007.

BY THE COURT:

_____
Bruce S. Jenkins
United States Senior District Judge

**IT IS FURTHER ORDERED** that consistent with the mandate of the court of appeals, the Order, filed September 25, 2003 (dkt. no. 638), is hereby VACATED;

**IT IS FURTHER ORDERED** that the Flying J Plaintiffs' Motion to Enforce May 2001 Settlement Agreement, filed May 31, 2002 (dkt. no. 573), is hereby DENIED; and

**IT IS FURTHER ORDERED** that the Order, filed February 11, 2004 (dkt. no. 653) is hereby VACATED.

**Let Judgment be entered accordingly.**

DATED this _15_ day of November, 2007.

BY THE COURT:

Bruce S. Jenkins
United States Senior District Judge